**FIVE TWELVE LOCUST, Inc.**

v.

**MEDNIKOW et al.**

No. 43890.

Supreme Court of Missouri.

Division No. 1.

July 12, 1954.

Motion for Rehearing and to Direct Correction of Material Omission in Transcript Denied Sept. 13, 1954.

J. Raymond Dyer, St. Louis, for appellants.

William Kohn, St. Louis, for respondents.

HOLLINGSWORTH, Judge.

This is an appeal from a decree dismissing the cross-claim of appellant-defendants

Mary S. Dyer et al., seeking a mandatory injunction. Respondent Melvin J. Mednikow is the record owner of the seven story Oriel Building in the City of St. Louis. The other respondents, whom it is unnecessary to name herein, are the owners of unrecorded beneficial interests in said building. Appellants are the owners of an undisclosed undivided interest in the property lying to the east of the Oriel Building. The defendant owners of other fractional interests of the property lying east of the Oriel Building likewise filed a cross-claim against respondents, which the trial court also dismissed with prejudice, but those cross-claimants did not appeal.

The Oriel Building, erected in 1891, is situate at the southeast corner of the intersection of Sixth and Locust Streets in the City of St. Louis. It has a frontage of approximately 45.61 feet on the south side of Locust. The property of cross-claimants, with a frontage of 82 feet, 2⅔ inches, on the south side of Locust Street, lies immediately east of the Oriel Building. Both properties have a depth of 70 or more feet to the south of Locust Street.

On and prior to January 1, 1949, a six story building, known as the Hunleth Building, was situate on cross-claimants' property. It had been erected about twenty years prior to the erection of the Oriel Building. As of January 1, 1949, cross-claimants leased the property on which stood the Hunleth Building to Five Twelve Locust, Inc., a subsidiary of the First National Bank of St. Louis, for a term of seventy years, expiring on July 19, 2019, for a total rental of $1,411,021.46, plus payment of all taxes, general and special. The lease provided that the Hunleth Building would be razed and a new bank building, to cost at least $750,000, would be erected on the property by and at the cost of lessee.

Prior to razing the Hunleth Building, a dispute arose between the respondent owners of the Oriel Building and Five Twelve Locust, Inc. (hereinafter referred to as the "lessee"), with respect to the rights of respondents and the lessee in and to the west wall of the Hunleth Building and the east wall of the Oriel Building, which walls were partially adjoining. The lessee filed a declaratory judgment action against respondents for the purpose of obtaining an adjudication of those rights. The dispute between those parties was settled by two written agreements and the suit was dismissed. However, notwithstanding the dismissal, the appellant cross-claimants (and the other cross-claimants) were permitted to thereafter file cross-claims against respondents, to which the respondents answered, thereby making up the issues here presented on appeal.

The cross-claim of appellants alleged that when lessee razed the west wall of the Hunleth Building it was found that the footings of the east wall of the Oriel Building encroached upon appellants' property below the surface, and that the east wall of the Oriel Building above the surface overhung their property line in a "Leaning Tower of Pisa effect"; that portions of the east wall of the Oriel Building were only 2½ inches thick and some portions were non-existent, the owners of the Oriel Building having used the west wall of the Hunleth Building as a "protective facing"; that the overhang of said Oriel Building wall and the use of the west wall of the Hunleth Building as a protective facing was unknown to cross-claimants until the Hunleth Building was razed; that the above and below ground intrusion and overhang of the Oriel Building "while adverse to said cross-claimants, was not open nor notorious, nor acquiesced in by them or their predecessors in title, nor was any authority in any way given the owners of said Oriel Building, or their predecessors in title, by said cross-claimants or their predecessors in title for such encroachment, intrusion, overhang or protective facing brattice use, at any time whatsoever."

The cross-claim of appellants further pleaded that the intrusion and overhang aforesaid made it impossible for them to comply with their lease agreement with lessee or to require lessee to comply with its obligations set forth in the lease; that

the east wall of the Oriel Building, as constructed and maintained throughout the years, was in violation of the building code of the City of St. Louis; that the intrusion and overhang was a trespass upon their property; and that they were irreparably damaged unless granted equitable relief.

The prayer was for a mandatory injunction against respondents to compel them to "rectify" the east wall of the Oriel Building to conform to the building code and to remove from cross-claimants' premises, at and above the ground level, the said intrusion and overhang, and for general relief.

The answer of respondents was an assertion of title by adverse possession to such portions of cross-claimants' property as was occupied by the Oriel Building and a denial of the other allegations of appellants' cross-claim.

The trial court found that the Oriel Building had occupied the land and space here in dispute since its erection sixty years prior to the institution of this suit; that none of the cross-claimants nor any of their predecessors in title had been seized or possessed of the ground and space occupied by the east wall of the Oriel Building within ten years prior to the commencement of the suit and that cross-claimants were barred from asserting any right, title or interest therein; that title thereto was vested in respondents by adverse possession; and that if cross-claimants had not been barred from asserting title to said ground and space, still they would not have been entitled to the injunction prayed because the cost and damage of removing the claimed encroachment would be greatly disproportionate to the injury, if any, suffered by cross-claimants.

It was stipulated that the fair market value of the land in question, exclusive of improvements, was $5,000 per Locust Street front foot.

To establish their cross-claim appellants introduced in evidence the lease agreement, numerous inspection reports, plats and photographs, and the testimony of several experts. There is, however, little dispute as to the facts.

In June, 1951, Pittsburgh Testing Laboratory, at the instance of lessee's contractor, made an inspection of the site and condition of such portion of the east wall of the Oriel Building to which it could obtain access. It found the wall to be a "curtain wall" comprising precast light weight burlap encased concrete panels, 1¾ inches thick, 24 inches long and 14 inches high, with masonry supports at each end thereof and four upright cast-iron columns in between and "supported by the steel floor beam and running to the steel floor beam above. These panels were plastered with conventional plaster on the inside. This construction apparently extends to the roof line of the Hunleth Building. The expanded metal lath and additional plaster is the result of later remodeling and alterations. Above the roof line of the Hunleth Building these panels were plastered on the outside with a sand cement plaster for the purpose of weatherproofing." It further found: "In the absence of ties between the Oriel Building curtain wall and the Hunleth Building brick masonry wall, it is apparent the curtain wall is self supporting, by reason of the fact of the clear anular space between these two walls. However, from the previously described construction it is also apparent that the panels comprising the curtain wall have little lateral strength and in all probability have a minimum of weather resistance with respect to moisture and water penetration. For this reason, construction difficulties attendant to removal of the Hunleth Building brick masonry wall present definite construction problems, but it cannot be said with the knowledge at hand that the Hunleth Building wall cannot be removed without disturbing the curtain wall of the Oriel Building."

In July, 1951, a survey was made. It showed the brickwork of the east wall of the Oriel Building to be east of the property line, as follows: At the top of 7th story, 0.30 feet (3⅝ inches); at the top of 6th story, 0.22 feet (2⅝ inches); at the top of 5th story, 0.15 feet (1⅞ inches); at the top of 4th story, 0.13 feet (1⅝ inches); at the top of 3rd story, 0.17 feet (2⅛

inches); and at the top of 2nd story, 0.17 feet (2⅛ inches). This survey also showed the terra cotta facing of the building's northeast corner at ground level to extend ⅛ inch east of the property line. Thus, the maximum overhang of the brick facing of the east wall of the Oriel Building is shown to be 3⅝ inches at the top of the building and the minimum overhang to be ⅛ inch at the ground level.

A survey of August 16, 1951, shows the corners and the intervening iron columns supporting the east wall of the Oriel Building, at the seventh floor line, to extend eastward over the property line, as follows: At the northeast corner of the building, 2⅝ inches; at the first iron column to the south thereof, ⅛ inch; at the second iron column, ⅛ inch; at the third iron column, on property line; at the fourth iron column, ¼ inch; and at the southeast corner the word "inaccessible" appears.

It was following these surveys that lessee voluntarily dismissed its suit without prejudice. Sometime shortly thereafter the Hunleth Building was razed to the ground level. Another survey was then made, especially with reference to the extent to which the four iron columns of the Oriel Building extended eastward beyond the property line. This survey reveals that each column so extended not to exceed in any instance more than 2 inches, but that the base plates thereof extended more than a foot and that granite supports thereunder extended, in some instances, more than 2 feet. When the above-ground wall of the Hunleth Building was razed, it was further found that the ends of two or three iron girders protruded horizontally from the east wall of the Oriel Building a distance of about six inches.

On April 15, 1952, respondent Melvin J. Mednikow and lessee entered into an agreement, the substance of which was, as follows: a recital that respondent claimed "certain rights in the nature of party wall rights in and to the west wall of the Hart (Hunleth) Building, which such claims were denied by" lessee; a recital that the

Oriel Building at all times had and now has a structurally independent east wall unconnected with the west wall of the Hunleth Building except (a) an area of approximately 900 square feet in which the only dividing wall between the two buildings was the west wall of the Hunleth Building, upon which plaster had been applied by the former owners of the Oriel Building directly to the brick wall of the Hunleth Building; (b) an area of approximately 300 square feet in which the only dividing wall between the buildings was the west wall of the Hunleth Building; and (c) certain iron girders extending eastwardly beyond the east wall of the Oriel Building a distance of 6 inches or more; a recital that Mednikow claimed and is now claiming that by reason of the long and continued use by the present and former owners of said Oriel Building of the portions of the wall of the Hunleth Building in the manner described in (a), (b) and (c) above he is entitled to such continued use and that lessee is obligated not to interfere with the same and to protect the Oriel Building during destruction of the Hunleth Building, and that Mednikow has acquired prescriptive rights to the user of certain granite pillars (apparently underpinning), all of which rights are denied by lessee; that it is the desire of the parties to settle and compromise their differences. It was then agreed that lessee pay to Mednikow $1,650 upon completion by Mednikow of the work herein undertaken by him under this contract; that Mednikow would at his expense construct and maintain curtain walls to protect the Oriel Building during the wrecking of the Hunleth Building and construction of the new building; that Mednikow at his expense would cut off the horizontally projecting iron girders flush with the east wall of the Oriel Building, and that Mednikow at his expense would underpin the Oriel Building.

On June 24, 1952, Mednikow and lessee entered into a supplemental agreement. It referred to the agreement of April 15, 1952; recited that the parties had ascertained more accurately the position of cer-

tain footings or foundations of the Oriel Building located under the four iron columns supporting the building and the positions of certain cast-iron plates forming the connection between the footings and the columns and the footings and foundations at the northeast and southeast corners of the Oriel Building; recited that lessee was claiming that such portions of said footings and iron plates encroached upon the premises leased by it, which claims Mednikow denied; recited that the cost of underpinning the Oriel Building would be increased by reason of alteration in the footings and foundations of the Oriel Building required to eliminate the claimed encroachments; and recited that it would be necessary in eliminating the claimed encroachments to remove and thereafter replace certain fixtures and equipment in the Oriel Building, including plumbing, heating and electrical fixtures. Lessee then agreed to do the necessary underpinning and to protect and preserve the Oriel Building in doing so; Mednikow agreed to pay $5,000 toward the cost of the underpinning; Mednikow expressly waived "any and all rights or claims of every kind with respect to said claimed encroaching footings or foundations of the Oriel Building or to any portions thereof, or to any other portions of said Oriel Building below the former basement floor level of the (Hunleth) Building and extending over and upon the premises leased by (lessee), whether heretofore discovered or not, and upon any ground or for any reason whatsoever, including adverse possession or limitation, and (Mednikow) hereby specifically disclaims any such right, title or interest in or to any portion of the premises held under lease by (lessee) below the former basement floor level of said (Hunleth) Building and lying east of the property line dividing the respective premises of the parties at such level. * * * Nothing herein contained, however, shall be construed to affect any of the rights which are now claimed or may hereafter be claimed by (Mednikow) in and to all space occupied by said Oriel Building and in and to all portions of the Oriel Building above the former basement floor level of said (Hunleth) Building; provided, however, that (Mednikow) shall remove certain projecting iron or steel beams or girders as provided in said agreement dated April 15, 1952; and nothing herein contained shall constitute an admission by (lessee) binding upon it or upon any of the owners of the premises leased by (lessee) with respect to the validity of any such claims of (Mednikow)."

Subsequent to the execution of the last above mentioned agreement, the foundation of the Oriel Building was set back upon the property line. No settlement of the building resulted from the underpinning; no change was made in the position of the east wall. It remained in a safe condition.

Subsequent to the razing of the Hunleth Building, respondents applied a $2\frac{1}{4}$ inches protective coating of cement or cement stucco to that portion of the Oriel Building wall extending from the second story level to the floor level of the seventh story. The portion of the wall above the seventh story floor, and which extended above the roof of the Hunleth Building, had been plastered with a similar coating ever since it was erected.

Mr. Bender, a member of the architectural firm which planned the new building to be erected by lessee, after determining the extent of the overhang of the Oriel Building as it extended upward from the ground level, set the new building about $2\frac{1}{4}$ inches east of the property line. This will leave a space between the two buildings of approximately $2\frac{1}{4}$ inches, perhaps more in some places. (Appellants construe Mr. Bender's testimony to mean that the new building was set back $2\frac{1}{4}$ inches beyond the maximum overhang of $3\frac{5}{8}$ inches rather than $2\frac{1}{4}$ inches beyond the property line. Perhaps the witness did intend to testify as contended by appellants and we will so construe Mr. Bender's testimony.) The separation of these walls does not create a dangerous situation in regard to the elements. The Oriel Building east wall "will be flapped to keep the elements from going down between the two walls

* * *." The parapet wall of the new building will be 7 or 8 feet above the Oriel Building.

Edward Costello, a civil engineer employed by the contractor for the erection of the new building, testified that no difficulty arising from the condition of the east wall of the Oriel Building was now expected in connection with the construction of the new building. No changes were made in the structural plans of the new building and its area would be as originally planned.

John J. Riley, a civil engineer employed in the Building Commissioner's office at the City Hall, inspected the east wall of the Oriel Building. He could not determine its composition or thickness; it was a non-bearing panel wall, extending from the basement to the roof. He found the Oriel Building to be a "class 4 building." His inspection did not reveal whether the east wall of the building complied with the building code requirements of a class 4 building. Assuming the wall to be constructed as found by the Pittsburgh Testing Laboratory (hereinbefore set out), the witness said that a non-supporting wall of a class 4 building "should be solid masonry of concrete, brick or sand-brick eight inches thick or reinforced concrete wall six inches thick. * * * I don't know of any type wall like that (the wall here involved). This is my first experience, and the code doesn't mention that wall, so I wouldn't be able to know just how thick a wall like that would be, * * *." He thought the wall was 4 or 5 inches thick. "If there is a wall designed as a four-hour wall, non-bearing wall, such as this, with the proper laboratory tests that is certified and submitted with the materials that go to make up this and dimensions to the Building Commissioner he can approve or disapprove that wall as a four-hour wall or for use in the building." No application has been made to the Building Commissioner in regard to the Oriel Building wall. It is the witness' opinion that a wall constructed as is this wall, less than 6 inches in thickness, does not constitute a "four-hour wall." (A "four-hour wall," as defined in the code, refers to its fire resistive qualities for a period of four hours.) Witness did not know the provisions of the building code as of the time the Oriel Building was erected.

Respondents' evidence tended to show that it would cost $100,000 to tear down the east wall of the Oriel Building and reconstruct it "as suggested here." The ground on which the Oriel Building is situate is assessed separately from the building. The building is assessed as it exists as a whole. The respondents and their predecessors have paid the taxes on the Oriel Building, as it existed, for more than sixty years.

■ For respondents to establish title by adverse possession to the area occupied by the portion of the east wall of the Oriel Building extending beyond the record division line between respondents' and cross-claimants' properties, it was necessary that the greater weight of the evidence show that respondents, and their predecessors in title, had been in (1) hostile, that is, under claim of right, (2) actual, (3) open and notorious, (4) exclusive, and (5) continuous possession thereof for more than ten years. State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174, 176; City of Kirksville v. Young, Mo.Sup., 252 S.W.2d 286, 288.

Appellants contend that the use and possession of respondents and their predecessors in title was not hostile, continuous and exclusive for the statutory period. This contention is based upon an alleged admission made by counsel for respondents in his opening statement and upon a recital in the first agreement entered into between respondents and the lessee. In his opening statement, counsel for respondents, in referring to the controversy between the lessee and respondents as reflected in lessee's petition for a declaratory judgment and respondents' answer thereto, said: "The only thing that they were concerned about is whether this wall separating the two buildings was a common wall or whether it was not a common wall, and we claimed at that time—we didn't know—it was a common wall; they claimed it wasn't, and we settled our dif-

ferences and the case was dismissed." And in the agreement, there was a recital that said declaratory judgment action dealt with the "respective rights" of the parties "in the west wall of the (Hunleth) Building and in the east wall of the Oriel Building," and a further recital that in said action that respondents "claimed certain rights in the nature of party wall rights in and to the west wall of the (Hunleth) Building, which such claims were denied by (lessee)."'

■ In the first place, even if the defense asserted by respondents against lessee was inconsistent with the defense asserted against appellants (we think it was not), respondents had the right to assert any number of defenses alternately or hypothetically to the action brought by the lessee or the cross-claim of appellants. Section 509.110 RSMo 1949, V.A.M.S. The ultimate test is what the credible evidence shows with reference to either of the alternately pleaded defenses. But the fact that respondents at first asserted an undefined "party wall" right in and to the west wall of the Hunleth Building is not necessarily inconsistent with an adverse claim of title to the entire east wall of the Oriel Building. The evidence definitely shows that these walls were separate and independent structures, each self-supporting with a space between, and with a complete absence of any tie. The facts in this case are unlike those in the case of Maremont v. Ovenu, 329 Ill. 374, 160 N.E. 572, cited by appellants. In that case the facts showed an established party wall with a definite "tie-in" and a common user.

When the Oriel Building was erected in 1891 with an independent east wall adjacent to the then long prior thereto existing Hunleth Building, the owner clearly intended it to be a part of the Oriel Building separate and apart from any connection with the Hunleth Building. In the absence of evidence to the contrary, we think it must be inferred that the original builder claimed all of the land and space above the land that the east wall of the Oriel Building occupied when it was constructed—and there is no suggestion that

its original position has in any manner changed. Furthermore, it would be absurd to infer that any subsequent owner of the Oriel Building ever claimed any less than title to the whole of the building, the land upon which it was situate and the space it occupied above the land. Such a conclusion would be contrary to human experience. See State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174, 176, and the cases cited therein.

But appellants further assert that "the alleged use and possession of respondents and their predecessors were not 'actual' for the statutory period as regards the portion of the encroachment covered by the cement stucco added after the Hunleth Building was torn down, which under the evidence was $\frac{3}{4}$ths of an inch below and 2 and $\frac{1}{4}$th inches above, for the 70 foot length." Unquestionably, the application of an additional coat of plaster from ground level to the floor level of the 7th story increased the 'actual' encroachment to the extent of its thickness. But, when the wall is considered as a whole, the added plastering did not materially increase the already existing encroachment of $3\frac{5}{8}$ inches at the roof level. The portion of the Oriel Building wall above the 7th floor level (and which extended above the roof of the Hunleth Building) had been covered with weatherproofing plaster for many years, presumably since the Oriel Building was erected. The new plaster of which appellants complain was below the old. Its effect, insofar as additional substantial encroachment is concerned, tended only to make the wall a vertical plane, as distinguished from a "Leaning Tower of Pisa" wall. In effect, it added nothing to the already existing encroachment. Furthermore, the plaster was placed there in compliance with Mednikow's contract with lessee, wherein Mednikow agreed to construct a curtain wall to protect the Oriel Building during construction of the new building. We think there is no merit in the contention.

Appellants' next contention is that respondents' possession was not "open and notorious." They say that the visible ground level encroachment at Locust Street

was only ⅛ inch and that south of Locust it was hidden; that the overhang was not ascertainable without a survey or by climbing to the roof of the Hunleth Building. We think appellants overlook the important and controlling fact that the Oriel Building actually and physically occupied the ground and space here in question for a period of sixty years. Its width and height were, of course, openly visible to whomsoever viewed its front. In 4 Tiffany's Real Property, 3rd Ed., Section 1140, pp. 419–421, it is said: "The possession must, it is said, be 'visible' and 'notorious', so that the owner may have an opportunity to learn of the adverse claim, and to protect his rights. Actual knowledge of the possession on the part of the true owner is not, however, necessary, it being sufficient that he could have learned thereof by the exercise of proper diligence. *And since the requisites of 'actual' possession are usually defined with reference to the sufficiency of such acts to affect the owner with notice of the adverse claim, it would seem somewhat questionable whether there can be any 'actual' possession which is not at the same time 'visible' and 'notorious'.*" (Emphasis ours.) See also State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174, 177.

This is not a case where respondents claim beyond the cubic confines of the building. They are claiming only what the public knew, or by the exercise of ordinary eyesight could have known, to wit: the cubic area physically and visibly occupied by the building. It is beside the point that appellants may not have known or appreciated the fact that the building extended east of their property line. Incidentally, there is no evidence that they did not so know. They did know of course, that it occupied the area upon which it stood and they certainly are chargeable with notice of the limits of their own property line.

We hold that the evidence shows respondents and their predecessors in title are and for more than ten years have been in the hostile, actual, open and notorious, exclusive and continuous possession of the premises here in question for more than ten years prior to the institution of this action.

Appellants next contend that "under the evidence in the instant case the wall is defective under the Building Code, both as to composition and thickness. It does not afford the 4 hour fire resistance required under that Code. Both by reason of that, and by reason of its lean, it is a hazard, and its unrectified continuation is not in the public interest. Instead, under the law its encroachment should be ordered removed, regardless of any disparity in the cost of that removal as compared to the damage sustained by cross-claimants and their lessee through continuation of the encroachment." In support thereof they cite: Pradelt v. Lewis, 297 Ill. 374, 130 N.E. 785, 14 A.L.R. 828; Meyer v. Metzler, 51 Cal. 142, 144; 43 C.J.S., Injunctions, § 30, p. 463; 5 Pomeroy, Eq.Jur., 2nd Ed., Section 1922, p. 4364.

In the Pradelt case, supra, the south wall of defendants' building at various points leaned over against plaintiffs' building and had caused considerable injury. No question of adverse possession was involved. The trial court granted mandatory injunction to compel the removal of the encroachment. In the Meyer case, supra, defendants' leaning wall was in such proximity to plaintiff's wall that he could not repair and maintain his property. No question of adverse possession was involved. A mandatory injunction was issued to require defendants to remove the encroachment. Neither of these cases nor the text citations above set forth deal with the situation here presented.

Appellants cite us to no case and we have found none showing their right to invoke the provisions of the St. Louis Building Code in the public interest. Neither is there any substantial evidence that the Oriel Building wall constitutes a hazard to appellants' premises, either by reason of its lean or the fact that it does not constitute a "four hour wall", within the meaning of the building code. Appellants' own witnesses, in speaking of the lean of the wall, said it was "in a safe condition." There is no evidence that the City would not

approve the Oriel wall as it is now constructed and exists, expecially in view of its close proximity to the wall of the new building, which latter wall will be "flapped" over the top of the Oriel wall so as to exclude the elements and, for all practical purposes, the two walls constitute one wall. The new building wall will be composed of concrete and brick and, as stated, will extend above the Oriel wall. It is of some significance that the lessee, who is spending in excess of $750,000 for the new building and who expects to occupy it for about 65 years, is not concerned with any hazard to the new building by reason of the position or construction of the Oriel wall. There is a total failure of any evidence to support appellants' plea that the position and construction of the Oriel wall has in any manner resulted in any impairment of the rights or obligations of either party to the lease contract. Appellants have shown no injury, present or prospective.

We are convinced that appellants made no case for a mandatory injunction and that the judgment was for the right party and should be affirmed.

It is so ordered.

All concur.